### GRAVES v. UNITED STATES.
#### No. 4239.

United States Court of Appeals
Tenth Circuit.
Aug. 21, 1951.

Rehearing Denied Sept. 7, 1951.

580

J. Paul Jorgensen, Wichita, Kan. (H. C. Castor, Wichita, Kan., on the brief), for appellant.

Malcolm Miller, Asst. U. S. Atty., Topeka, Kan. (Lester Luther, U. S. Atty., and Eugene W. Davis, Asst. U. S. Atty., Topeka, Kan., on the brief), for United States.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

The appellant, Ray H. Graves, was indicted in the District of Kansas on three counts for wilfully attempting to evade and defeat his Federal income taxes for the years 1943, 1944, and 1945, respectively, by making and filing false and fraudulent returns for those years. On trial to a jury he was acquitted on counts one and three covering the taxable years 1943 and 1945. This appeal is from a conviction and sentence on count two covering alleged evasion for the year 1944.

During 1944, Graves owned and operated four drug stores located at Lyons, McPherson, Junction City, and Great Bend, Kansas. These stores were operated by managers who kept books showing daily gross receipts and cash expenditures. In the usual course of business, the gross receipts, less the cash expenditures, were deposited in store bank accounts where the stores were located. At the end of the year the manager's daily receipt and expenditure book was delivered to Mr. and Mrs. Graves in McPherson, where Mrs. Graves maintained a set of single entry "Greenwood Books." The yearly gross receipts from all the stores were entered in the books in one lump sum, but the expenses were itemized and allocated to each store. The income tax returns for the years in question were prepared by Graves' accountant from the Greenwood Books and it is admitted by the government that the return for the year 1944 is in substantial agreement with the Greenwood Books, which are also in substantial accord with the aggregate of the store bank accounts and cash expenditures for that year.

The basis of the government's case is that Graves realized income from the drug stores which was not deposited in the store bank accounts, entered in the Greenwood Books, or reported in his return. This purported income was represented by currency deposits in various special and personal bank accounts of Mr. and Mrs. Graves, purchase of government bonds, sale of cattle, loan of money, and a personal check from a store manager representing store receipts. The evidence in that connection showed that when, in 1945, an Internal Revenue Agent contacted Graves for a routine check on his income tax liability for the years 1942, 1943, and 1944, he was furnished with the Greenwood Books reflecting the gross receipts and itemized expenses of the various stores. When the agent requested bank statements to verify the gross receipts, Graves gave him the statements from four business or drug store accounts and one personal account, and advised him that the store bank accounts, plus the cash expenditures, should equal the gross receipts from the stores. In auditing these bank statements, the agent found a foreign check by Graves on another bank account. When asked about this check, Graves stated that it was on his cattle account and involved a cattle deal which had no bearing upon his drug store business. Since the returns did not show any income from cattle, the agent requested Graves' bank account disclosed by the foreign check. Further investigation disclosed nine other special or personal bank accounts in various banks, in the name of either Mr. or Mrs. Graves, including one at Vinita, Oklahoma, in the name of Mrs. Myrtle Graves, represented by two cash deposits in the early part of 1945. Twelve of these 14 accounts had been active during the year 1944. The investigation also revealed that during the year 1944 Graves had purchased United States Bonds, with currency, in the sum of $5,287.50. There were currency deposits to Mrs. Graves' personal account in the Home State Bank at McPherson, in the total sum of $6,700, and deposits to Graves' special and personal accounts in different banks in various sums, particularly the personal check of Store Manager Cramer in the amount of $4,000. Cramer testified that he had been instructed by Graves to deposit some of the drug store receipts to his personal account

and that he did so, retaining duplicate deposit slips for the same, and when, in August, 1944, he was transferred from the Lyons store to the Great Bend store, he gave Graves his personal check for $4,000 representing the amount of store receipts he had deposited to his personal account. In the year 1944, Graves loaned Store Manager Owens $4,000 in currency. The agent was unable to ascertain the source of the currency for this loan and, therefore, treated it as store income for that year. In the same year, Graves received $15,125.84 from the sale of cattle which he had purchased in 1943. Although the cattle were sold for less than their cost, plus feed and pasture, the agent employed the inventory method to treat the receipts as income to Graves in 1944. The agent testified that being unable to ascertain or identify the source of any of these funds, he treated them as income in the year in which they were received or deposited. Thus, by taking the total drug store gross receipts shown by the store bank accounts and the Greenwood Books and adding thereto currency deposits to Mr. and Mrs. Graves' personal and special bank accounts in 1944, the amount of the bonds purchased with currency, the Cramer check for $4,000, the Owens loan for $4,000, the receipts from the sale of cattle, and after making undisputed adjustments, and deducting therefrom the amount of the disbursements and expenses shown by the books, the government agent increased Graves' reported income for the year 1944 by roughly $30,000. A schedule showing this computation was introduced in evidence over Graves' objections. The proof for the taxable years 1943 and 1945 followed substantially the same pattern, showing currency deposits to special accounts and other funds from unidentified sources.

█ █ Graves assails this method of proving a willful attempt to evade income tax liability, contending that currency deposits from unidentified sources are insufficient to sustain the heavy burden resting upon the government to prove its case. It is, of course, true that currency deposits in Graves' bank account, standing alone, do not prove unreported income.

The jury was so instructed. But, currency deposits from unidentified sources which are not reflected in the books and records from which income tax returns are made and tax liability determined are substantial evidence of an under-statement of income and it is incumbent upon the taxpayer to overcome the logical inferences which may be drawn from these proven facts. It may also be competent evidence to prove a willful intent to evade liability for the tax thereon. See United States v. Hornstein, 7 Cir., 176 F.2d 217; United States v. Venuto, 3 Cir., 182 F.2d 519; Stinnett v. United States, 4 Cir., 173 F.2d 129; Gleckman v. United States, 8 Cir., 80 F.2d 394, and United States v. Zimmerman, 7 Cir., 108 F.2d 370.

█ The trial court instructed the jury that the government's proof was only circumstantial evidence of a willful intent to evade income tax liability and was at pains to tell the jury that such evidence must be so strong and convincing as to exclude any reasonable ground for believing the accused to be innocent. The jury was also properly told that the government was not required to prove the exact amount of the tax due as alleged in the indictment, but that it must find beyond a reasonable doubt that the defendant received some substantial amount of unreported taxable income in the particular calendar year involved and that he wilfully attempted to evade and defeat the tax on such additional net income. See Stinnett v. United States, 4 Cir., 173 F.2d 129. The jury was instructed that a willful intent to evade or defeat income tax liability might be inferred from the conduct of the defendant, such as keeping a double set of books, making false entries or alterations, concealing assets, covering up sources of income, and any other conduct, the likely effect of which would be to mislead or conceal. We think these instructions, together with others, properly stated applicable law.

A certified public accountant testifying for Graves stated that he made an audit of Graves' returns for the year 1944 and the other years involved in the indictment,

based upon the Greenwood Books and the store bank accounts, supported by the monthly sales tax reports, and that the returns were in substantial agreement with this data. He also testified that for the year 1944 he found a total of $12,374.56 deposited in various special and personal bank accounts, which was not reflected in the Greenwood Books or the store bank accounts; that he also found the bond purchases with currency in the sum of $5,250, the Owens loan, expenditures for cattle pasture, $1200 paid by Graves on the purchase of a home, totaling $23,142.56. He made some adjustments on information from Graves, but he did not attempt to identify the source of these funds, basing his schedule solely on the store bank accounts, the Greenwood Books, and the monthly sales tax reports.

The store managers testified, in effect, that in each instance they kept their daily cash receipt books which, plus the cash expenditures, reflected the store income deposited in the store bank accounts; that at the end of each year the daily receipt and expenditure books were delivered to Mr. or Mrs. Graves. From this testimony it is contended that since the entries in the Greenwood Books were taken from the daily receipt books, they should and do necessarily reflect all of the income from the stores, and that there is no other unreported income from the stores.

It is said that the only evidence that store receipts were not deposited in the store bank accounts and reflected in the Greenwood Books is the testimony of Store Manager Cramer concerning his $4,000 check to Graves representing store receipts withheld and deposited in Cramer's personal account at Graves' direction. It is argued that any permissible inference of unreported income from this testimony is competely dissipated by Cramer's testimony to the effect that his daily account book reflected all store sales from which the lump sum receipts in the Greenwood Books were taken.

While the jury was deliberating upon its verdict, it returned to the court room to ask the court the following question: "Was the 4000.00 Dollars paid to Mr. Graves by Mr. Cramer accounted for by the Defendant's evidence?" After a conference with counsel, out of hearing of the jury and reporter, the court instructed the jury that the submitted question was one of fact "wholly within the realm of you Jurors." Soon thereafter the jury returned a verdict of guilty on count two for the year 1944. It is suggested that this question by the jury indicates the significance placed on Cramer's testimony in arriving at a verdict and it is earnestly contended that the jury should have been instructed, as a matter of law, that the item had been accounted for by inclusion in the lump sum receipts entered in the Greenwood Books.

Cramer did testify generally that his daily receipt and disbursement book correctly reflected the store receipts, and the book reflecting sales and disbursements from January until August was introduced in evidence, but there was no evidence tending to show that these receipts are reflected in the lump sum entry in the Greenwood Books. Cramer positively testified that the $4,000 was taken from the drug store receipts at Graves' direction, deposited in his personal account, and returned to Graves by his personal check. This check was deposited in Graves' personal account and there is no other evidence that it ever found its way to the store bank account or to the Greenwood Books.

We think the trial court correctly instructed the jury that the question whether Graves reported the $4,000 in his return for 1944 was for it to decide.

Graves testified that the unreported funds had been earned in past years; that in 1917, when he went into the Army, he was worth between $25,000 and $35,000. That on his return he went into the bridge building business with his father, from which he netted at least $15,000 before going into the drug business in 1925; that he and his father had always operated with currency and used banks only when necessary; that he had $20,000 in currency in his father's safe when his father died in 1940. He emphatically denied that he had ever told Cramer to hold out cash from the

584

drug store account at Lyons and return it to him later; that the $4,000 deposit and other deposits to his account by Cramer "could have been borrowed money," or "money used for cashing checks."

Mrs. Graves testified that when she married her husband in 1930, he had between $50,000 and $60,000 in cash and that he usually carried a large amount of cash with him for the principal purpose of cashing checks at the stores, and that when his father died in 1940 she saw her husband take his $20,000 from the father's safe. She further testified that Graves became seriously ill in 1941 and that they decided that he should not carry so much cash, so they began putting it in different banks and purchasing bonds from time to time.

In rebuttal, the government introduced Graves' income tax returns from 1929 to 1942. The largest income reported was $7,177.37 in the year 1938. The income for the years 1930 through 1936 showed payments of interest on business indebtedness.

In these circumstances, it was for the jury to determine whether the money had been earned in prior years, carried as cash, and deposited in the bank during the latter years. In its discretion, the jury saw fit to acquit him for the years 1943 and 1945. It might have found otherwise. It was not convinced as to the year 1944 and we think the evidence amply supports its verdict.

Graves also complains of the admission of the government agent's schedule calculating or computing the income tax liability as evidence. The schedule was based on Graves' books and records, the currency deposits, and other data obtained from Graves. Although the jury was not bound by the summary, it represented the conclusion of the agent based upon facts in the record. The witness was cross-examined with respect to each and every item contained in it and it was clearly admissible. See United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546, and Carlson v. United States, 10 Cir., 187 F.2d 366.

The judgment is affirmed.