Wilbur K. Miller, Senior Circuit Judge, dissented.

Fred B. BLACK, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18926, 18927.

United States Court of Appeals District of Columbia Circuit.

Argued March 16, 1965.

Decided Nov. 10, 1965.

Petition for Rehearing En Banc and for Rehearing before the Division Denied Jan. 17, 1966.

Mr. Bert B. Rand, Washington, D. C., with whom Messrs. Hans A. Nathan, Warren E. Magee and Thomas G. Laughlin, Washington, D. C., were on the brief, for appellant.

Mr. K. William O'Connor, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Louis F. Oberdorfer, Messrs. John P. Burke, Richard B. Buhrman and Joseph M. Howard, Attys., Dept. of Justice, were on the brief, for appellee. Messrs. David C. Acheson, U. S. Atty. at the time the record was filed, and Frank Q. Nebeker, Asst. U. S. Atty., also entered appearances for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

These appeals are from convictions under two indictments charging appellant with violations of Section 7201 of the Internal Revenue Code of 1954. 26 U.S.C. § 7201. That statute imposes criminal sanctions upon "Any person who willfully attempts in any manner to evade or defeat" federal tax liability. One indictment related to the year 1956; and the other to 1957, 1958, and 1959. The 1959 count was dismissed by the Government at the outset of the trial, but the latter

eventuated in jury findings of guilt as to the other years. Concurrent sentences of confinement and fine were imposed.

Counsel have pressed upon us in brief and argument a large number of contentions, which vary greatly in their nature and substance. As befits the seriousness of the consequences faced by appellant, we have examined them all, although we think it neither feasible nor necessary to deal with each of them herein. The central and most substantial issue presented is whether a jury could permissibly have found from the evidence that appellant's conduct came within the proscription of the statute. Although appellant's unsystematic and unorthodox manner of operations leaves some obscurities as to both method and motive, we believe the jury was entitled to find as it did. Before coming to grips with that major question, we dispose of some of the other issues. In no instance have we found occasion to disturb the convictions.

## I

### 1. The Statute of Limitations

Appellant contends that prosecution under the indictment relating to 1956 was barred by the lapse of time. This issue was first raised by a motion to dismiss in the court where the indictments were first returned in the spring of 1963, i. e., the United States District Court for the Western District of Missouri. That motion was denied by Judge Oliver in an opinion reported at 216 F.Supp. 645. It was renewed in advance of trial after the case was transferred at the appellant's request to the District of Columbia in May of 1963. The motion was again denied by Judge Hart.

In view of Jaben v. United States, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965), decided while this appeal was under submission, we need refer to only one aspect of the issue. The charge of evasion in respect of 1956 was first initiated by the filing of a complaint with the United States Commissioner in the Western District of Missouri on January 29, 1963. If this complaint was founded upon an adequate showing of probable cause, it is clear that the 9-months extension proviso contained in the Internal Revenue Code, 26 U.S.C. § 6531, was operative and comfortably embraced the time of the subsequent return of the indictment. Jaben ends the argument as to that adequacy. The representations made to the Commissioner in that case are virtually identical in form and substance with those involved here. They were found to be sufficient by the Supreme Court there. We must take them to be so here.

### 2. The Fairness of the Trial

Appellant insists that the outcome of his trial was significantly prejudiced in a number of ways, ranging from the denial of his request for a long continuance or a transfer of the case back to Missouri to allegedly improper characterizations by the prosecutor in his opening and closing arguments. We do not find that any of these warrant reversal, and we confine our discussion to those upon which appellant's principal reliance is placed.

As noted above, this case was, at appellant's request, transferred in May of 1963 from Missouri to the District of Columbia for trial. The District Court here granted appellant extensive discovery, which was to be completed by January 15, 1964, and the trial was scheduled for February 17 thereafter. On February 4, appellant asked for a continuance until after the elections in November. He represented that, beginning in September, 1963, the linkage of his name in the press with that of one Robert Baker had created political overtones which would make a fair trial impossible. The Chief Judge heard the motion, and rejected the request for a continuance until after the elections, although he did fix April 13 as the new trial date. He explicitly held that there was no reason to think that a fair trial could not be held in the current atmosphere. Early in April appellant again sought a continuance, or alternatively, a transfer of the case back to Missouri. These motions were heard and denied by Judge Hart,

888

who was of the view that the scattered references in the papers to appellant from September, 1963, to February, 1964, did not create an unduly prejudicial atmosphere. Judge Hart thought that appellant exaggerated the degree to which the citizens of Washington were aware of his existence—a surmise which was later supported by the fact that no one on the jury panel responded affirmatively to the *voir dire* question by defense counsel as to whether they had ever heard of the defendant.

■ The questions of the continuance and the transfer were well within the range of discretion committed to the trial court in the dispatch of its business; and we find no indication that this discretion was abused in any way. Judge Hart examined with care the material submitted in support of the continuance; and he gave similar attention to the request for transfer, although that came at an unjustifiably late point in the proceedings. We have no occasion to disagree with his conclusions.

■ A second area of complaint relates to assertedly prejudicial press publicity occurring in the course of the trial. The jury were repeatedly cautioned to avoid the communications media with respect to the case. A mistrial was asked shortly after the trial started because of one headline in a Washington newspaper: "Baker Associate Black Goes On Trial for Evading $91,000 in U. S. Taxes." Although this is hardly a model of journalistic restraint under the circumstances, the jury had been cautioned earlier, and the defense did not press a suggestion that the jurors be interrogated about this headline. The defense did not request at the outset that the jurors be sequestered throughout the trial and, indeed, appeared to be considerably less than happy (to the point of objection, indeed) with the court's *sua sponte* determination to effect such sequestration midway through the trial.

Our reading of the record suggests that the defense was quite conscious of the tactical pitfalls involved in too much insistence by it on elaborate and repeti-

tive cautionary directions to the jury. It strikes us in the large that, once the trial had started, it was conducted just about as the defense preferred it to be, caught as it was in this perennial dilemma of over- or under-emphasizing the special circumstances of the defendant. When an adverse jury verdict is being appealed, this dilemma, of course, dissolves in the singleness of the purpose to get a new trial and a new chance with another jury. Thus, the prejudice proclaimed upon appeal may not have seemed to be such before the jury spoke. We, in fairness to the trial court as well as to appellant, must appraise it in the latter context; and we find no error.

■ A mistrial was sought at the time of the prosecutor's opening statement because of a characterization of appellant as one who held himself out as informed and influential in the ways of Washington. The trial court denied the request, but was alert to instruct the jury as to the non-evidentiary nature of opening statements and that it should not form opinions on the basis of them. It is also asserted that the trial was unfair because the prosecution lost no opportunity to refer to the parties and entertainments involved in appellant's expenses. The thrust of these arguments is essentially that appellant was tried, in substance if not in form, for some vaguely criminal offense of influence-peddling in addition to, or instead of, that of income tax evasion; and that determination of the latter charges must certainly have been affected by the former. The nature of appellant's own evidence was necessarily such, however, as to suggest that appellant's business activities were not of a wholly conventional nature; and we do not think the comments at the trial equated this with illegality. It was in appellant's interest to show large expense deductions, and he made the most of it. This could not help but paint the picture of a somewhat unusual business activity. Thus, such difficulties as this may have caused appellant seem to us inherent in his situation when accused of tax fraud—an accusation which was first

made in Missouri long before his activities in Washington began to be revealed there. We do not believe that the record contains reversible error because of the references now claimed to be prejudicial.[1]

## II

The theory of the Government's case against appellant is that, in respect of the years 1956–58, he received a total of $140,087.04 in income items which were not reported on his returns. Appellant's response to this, so it seems to us, is alternative in nature: He argues, first, that the Government failed to prove that these items were not reimbursements for expenditures made by him for the benefit of certain clients, involving no taxable gain to himself; and, secondly, that, even if the receipts did represent taxable income, he lacks the requisite criminal intent since he relied upon agents to prepare his returns from the information, assertedly complete, available to them. We examine these two points in their logical order, as just stated, and against the evidence of record relevant to each.

There is no significant dispute that appellant did receive some $140,000 more than he reported. This was made up of payments received from one individual and four companies. These last paid appellant other sums during the same period, which sums were shown on Forms W–2 or 1099 [2] filed by the payors, and which were included in appellant's returns. Appellant's returns as filed listed substantial amounts of expense deductions, but there was in each case a balance of taxable income; thus, the expenses claimed did not absorb the receipts reported, much less those that were not.

1. Errors requiring a new trial are also asserted to reside in the trial court's rulings on the admissibility of evidence and its charges to the jury. In the case of the latter, 15 specific instances of error are pressed upon us. In the case of most, if not all, of these claims, the particularity of the objection urged upon appeal was largely absent at the trial. Compare Rule 30, FED.R.CRIM.P., which requires appellate consideration of errors in the charge to be founded upon specificity in the objection made at trial. We have, in any event, examined the reasons given to us for the error in each case, and we see no need to reverse.

Similarly, the questioned rulings on evidence are, in our view, unavailing; and we note in particular only the one which appears to bulk largest in appellant's mind. This was the admission, over objection, of a brief filed with Internal Revenue Service by the Washington attorney representing appellant at the time the latter's affairs were under intensive consideration and when the Service was deciding whether to proceed against him criminally. Appellant's contentions with respect to this document seem to center upon a claim of inadmissibility because (1) the immateriality of possibly prejudicial matter in the brief far outweighed its probative value and (2) the brief was within the attorney-client privilege. As to the former, it is clear that the balancing judgment of the trial judge is what is involved, and we should reverse only if we can say that the balance unmistakably inclined the wrong way. We cannot say that it did. The central importance of the brief is that it shows the receipt of the unreported items of revenue. Its effort was to off-set these by items of expenditure—an effort which varied substantially from what was done at the trial. We think the trial judge was entitled to regard the materiality of this brief as unquestionable.

It seems clear from its face that the brief was not submitted solely as part of a negotiation over a settlement of civil liability, but as a last-chance effort to turn the tide against criminal prosecution. The frankness of its admissions is in this spirit. It is now claimed that the document was privileged, and could not be used against appellant without his consent. But the basic element of consent is not here lacking. There is no claim that the brief was prepared and filed without appellant's knowledge or acquiescence; and, under these circumstances, there appears to be no forbidden breach of the attorney-client privilege. See Banks v. United States, 204 F.2d 666 (8th Cir. 1953), vacated for reconsideration, 348 U.S. 905, 75 S.Ct. 311, 99 L.Ed. 710, aff'd 223 F.2d 884 (1955), cert. denied, 350 U.S. 986, 76 S.Ct. 472, 100 L.Ed. 853 (1956).

2. Form W-2 is the form filed by the employer, reporting compensation paid under circumstances where withholding is necessary. Form 1099 is used to report sums paid where no withholding obligation attaches.

Appellant, a native of Missouri, was in the consulting and public relations business. In 1955 he set up a Missouri corporation in Joplin, known as Blyco Corp. It was organized for him by his long-standing friend and attorney, Ralph Baird. The corporation had space in Baird's Joplin law office, and Baird was one of the corporation's officers and stockholders. Although Blyco Corp. was apparently designed to be the vehicle for appellant's business operations, he continued to function independently and for his own account. The record does not disclose clearly why this was so. It only shows a considerable overlapping of his and Blyco's activities.

The way the unreported receipts in question came to appellant requires at least a summary of his relationships with the five payors:

1. *Darby.*

Mr. W. E. Darby, the head of a Little Rock insurance company, retained appellant in 1956 to find out why a registration statement was being delayed at the S.E.C. Darby said the agreement was to reimburse appellant for expenses, with no fee to be paid unless appellant gave satisfactory service. Appellant submitted three unitemized bills for expenses, and received three checks in payment therefor, totalling $7,770.-50. Darby said he did not know how, or for whose benefit, the money was spent; and he filed no W–2 or 1099. The three checks were deposited in appellant's personal bank accounts.

2. *Jones Bros. Construction Co.*

The head of this Joplin company testified that appellant was retained in 1955 to pursue business contacts. For 1956–58, salary is shown as having been paid each year, and these amounts are reported. In each of the three years there were substantial expense reimbursements (1956— $10,160; 1957—$21,208.30; 1958— $30,000). Of these, only one—the 1957 total—was reported by appellant; and the record contains a letter written by him in March of 1958 to Jones, protesting the filing of a Form 1099 in respect of this amount. Jones had no itemization of how these sums were spent, although it charged them to engineering services.

3. *M–P Construction Co.*

This Carthage, Missouri, contracting firm retained appellant to find some work it could bid on. Appellant asked for expense reimbursements from time to time, receiving payments of $10,500 in 1956, and $6,500 in 1957. The former was reported but the latter not. No itemization was obtained by the payor, and no Forms 1099 were issued. (the 1956 payment appears to be the one case in which appellant reported an income item on his tax return which had not been reported on a Form 1099).

4. *Howard Foundry Co.*

Appellant was retained in 1955 by this Chicago company at a weekly salary plus expenses. Appellant submitted vouchers for expenses from time to time, without itemization; and they were paid. The problem which engaged appellant's attention was a renegotiation matter which was eventually transferred, as the client apparently wished it to be, from the Justice Department to the Air Force. Some checks were made payable to appellant, others to hotels of his designation. No Forms 1099 were issued, although the salary payments were covered by Forms W–2.

5. *Aeronca Manufacturing Company.*

Appellant was hired by this company as a consultant with respect to (1) dealing with Government prime contractors and (2) Government procurement matters generally. Appellant was to be paid for his services, together with reimbursement for expenses. Total payments of $14,430 in 1957 were reported by appellant, but $26,000 received by appellant in 1958 was not shown in

his return. No itemization in respect of this money was submitted by appellant, and no Forms 1099 were filed by the payor, assertedly through inadvertence.

For each of the years in question, appellant claimed, and was largely allowed, certain deductions on his return. These deductions appear similar to the transactions for which appellant was presumably being reimbursed by the payors just mentioned. Thus it is that appellant may fairly be taken to know that he needed to report these receipts and submit his own expense deductions to the Government by an appropriate deduction in his return. He appears not to have operated on the assumption that his payors' expenses, paid for by him with their funds, was a matter between them and the Government as to which he had no responsibility. Such an assumption is, of course, hardly compatible with appellant's failure to submit to the payors itemized explanations of the expenses for which reimbursement was assertedly being made.

The question would seem to be whether the Government is entitled to get to the jury on a showing of substantial unreported receipts of alleged expense reimbursements, when there is no explanation by either the payor or the payee of what use was made of the money. Here there is no issue as to whether appellant received the money. Neither is there any doubt that it was omitted from his income tax returns. It is now characterized as reimbursement of expenses, but the fact and nature of those expenditures are not established. May the jury infer wilful evasion, within the meaning of the statute, from this evidence? We are not unmindful that this is a criminal case, and that the proof is to be weighed in an appropriately exacting balance. We think, however, that in this state of the record the jury could, if it chose, bring in a sustainable verdict of guilt.[3] There

---

3. Appellant contends that the Government bears the burden of proving that the unreported receipts constituted taxable income, or, phrased another way, that appellant was not entitled to any offsetting deductions. This argument has been rejected in numerous cases. United States v. Bender, 218 F.2d 869, 871 (7th Cir.) cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955), is typical.

"The taxpayer's costs and other factors which would lessen his tax liability are peculiarly within his own knowledge. Accordingly, the law has placed upon him the burden of going forward with the evidence once the Government has established receipts in excess of those reported in his income tax return. * * *

"This rule is grounded on the realization that it would be virtually impossible for the Government to show the negative fact that a taxpayer had no unreported deductions or exclusions. In such a case the Government, having shown unreported income, is aided by the presumption that the deductions and exclusions listed by a taxpayer in his return are all that exist."

See, United States v. Shavin, 320 F.2d 308, 311–312 (7th Cir.), cert. denied, 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273 (1963); Dillon v. United States, 218 F.2d 97, 99 (8th Cir.), cert. granted, 349 U.S. 914, 75 S.Ct. 603, 99 L.Ed. 1248, cert. dismissed, 350 U.S. 906, 76 S.Ct. 191, 100 L.Ed. 796 (1955); United States v. Stayback, 212 F.2d 313, 317 (3d Cir. 1954), cert. denied, 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714 (1955); United States v. Link, 202 F.2d 592, 593 (3d Cir. 1953); United States v. Hornstein, 176 F.2d 217, 220 (7th Cir. 1949); See also McClanahan v. United States, 292 F.2d 630, 631–632 (5th Cir.), cert. denied, 368 U.S. 913, 82 S.Ct. 193, 7 L.Ed.2d 130 (1961); Small v. United States, 255 F.2d 604, 607 (1st Cir. 1958); United States v. Lennon, 246 F.2d 24, 27 (2d Cir.), cert. denied, 355 U.S. 836, 78 S.Ct. 60, 2 L.Ed.2d 48 (1957); United States v. Gannon, 244 F.2d 541 (2d Cir. 1957); Wolcher v. United States, 233 F.2d 748, 751 n. 4 (9th Cir.), cert. denied, 352 U.S. 839, 77 S.Ct. 61, 1 L.Ed.2d 56 (1956); United States v. Smith, 206 F.2d 905, 910 (3d Cir. 1953); Graves v. United States, 191 F.2d 579, 582 (10th Cir. 1951); Barrow v. United States, 171 F.2d 286 (5th Cir. 1948).

Of course, appellant was free to show that he was entitled to additional deductions which would offset the amounts received, see Small v. United States, supra, but this record will not support such a finding.

is that in the evidence which could justify a conclusion that appellant wilfully followed a course of evading his income tax liabilities by arranging to receive large sums of money for which he did not account in any way. Where the Government was known to be on notice by means of W–2 or 1099 forms, there was reporting of sums received; and, where such notice did not exist, reporting was ordinarily withheld. This is a recognizable pattern which emerges from the Government's case, and which could have caused the jury reasonably to conclude that it . constituted a conscious and knowing deception.

We turn now to appellant's defense that the most he was guilty of was hiring incompetent and unreliable agents to handle his income taxes—a lapse which may perhaps expose one to civil penalties for failure to pay the taxes properly owing, but not to criminal punishment.

The relationship between appellant and his associates, Ralph Baird and James Muskrat, is central to this issue. Baird, as has been said, was an old friend. He had served as appellant's attorney on various occasions since the beginning of his practice in 1938. When the appellant desired to establish his own public relations business in 1955, he used a room in Baird's Joplin, Missouri, law office as headquarters, most of appellant's time being spent travelling or in Washington. And, from this date, Baird played a prominent part in appellant's business, including the role already described in respect of Blyco Corp. He drafted contracts for appellant, as well as engaging

in some travel and consultation work on his behalf.

At the direction of appellant, Baird obtained the services of an accountant, James Muskrat, to prepare appellant's personal tax returns. Muskrat prepared appellant's returns for the years in question and also prepared the Blyco Corp. returns for 1957 and 1958. Appellant's files, records, and bank statements were available to him. But Muskrat's instructions were indefinite, and the supervision exercised by appellant was sporadic. When Muskrat did not know how to handle a particular item, he would consult with Baird.

Appellant maintains that Baird and Muskrat possessed all the information necessary for preparing an accurate return and that he relied upon them to do so.[4] He testified that Baird was responsible for maintaining, assembling and keeping the records of his activities; that all records accumulated during his travels were sent to Baird; and that the entire accounting operation for both his own activities and those of Blyco Corp. were entrusted to Baird and Muskrat. He further testified that he kept Baird informed of all his receipts.[5]

If appellant did in fact account so fully to Baird, Muskrat was apparently unaware of it. He testified that he had no knowledge of most of the checks that were alleged to be unreported income, although he could not be sure that there was not, somewhere in the correspondence files, documentation of those receipts. Nor did the manner in which Muskrat prepared the apppellant's re-

4. An investigator, retained in connection with the effort made by the attorney, Bernard, to avoid criminal proceedings, testified that his examination in 1961 of the files maintained in Joplin revealed evidence of all the unreported items.

5. "I sent him all checks, all the bank statements, and I sent him all the deposit slips. If I cashed a check some place I made a little note of it and sent it to him, or told him about it by phone. I tried to keep him fully abreast of all the things." The testimony of a public stenographer at a Washington hotel was

offered in corroboration. She testified to mailing copies of letters, statements, and airplane tickets to Baird. She stated, "Nothing was ever withheld, held back from Mr. Baird. In fact, Mr. Black had instructed me many times to send copies to Mr. Baird." But she only worked for appellant intermittently, and did not know whether everything pertaining to the appellant's business was sent to Baird. A memorandum, in Baird's handwriting, noting the receipt by appellant of $800 from Howard Foundry, was also offered to corroborate appellant's story.

turns reflect the existence of any regular method of accounting to the Joplin office.

For the 1956 return, Muskrat was given a listing of hotel expenses, W–2 forms, and bills. Appellant was present while the return was being prepared, and both appellant and Baird orally gave Muskrat information as to what was to go into the return. Appellant, although personally present and actively participating, did not advise Muskrat of any income except that shown on the return.

More time was spent in preparing the 1957 return, but again the procedures followed seem haphazard. Muskrat testified: "I carried on what I had started on the 1956 return, with no clear setting out of duties or instructions or anything. Just the ultimate result to accumulate the information for the tax return." His primary concern was obtaining a total on expenses; and, again, some expense information was obtained orally from both Baird and appellant. Muskrat wrote appellant, questioning him as to his income for 1957, but there is no indication that the letter was ever sent. In any event, Muskrat discussed Black's income with Baird, and the income used on the return was that reflected in either 1099 or W–2 forms.

That Muskrat was not receiving adequate information seems evident from his changed procedure in constructing the 1958 return. Because he was dissatisfied with the way previous returns had been put together and because appellant's business was expanding, Muskrat began, on his own initiative, to maintain books for the appellant.[6] These books

contained an income account in which he entered all income items, as well as other unidentifiable deposits that were necessary to balance the books. He would ask Baird about the unidentifiable items, sometimes receiving an explanation. At the end of the year, income reflected on 1099 and W–2 forms exceeded the amount stated in the income account, so he did not attempt to reconcile the two, but merely used the income reflected on the forms in making up the return.

Baird, on the other hand, showed a greater familiarity with appellant's affairs. He admitted knowing of most of the compensation arrangements appellant made with the five employers in question, but he denied knowledge of some particular receipts. As to the checks from W. E. Darby, Baird testified that he was satisfied from his own participation in the matter that the checks represented expenses incurred on behalf of Darby. Although he disclaimed knowing how much appellant had received, he testified that he knew of the arrangement with Jones Brothers Construction Co. He knew of appellant's relationship with the M–P Construction Co. And the arrangements with Howard Foundry and Aeronca were also familiar to him.

Baird insisted, however, that his responsibility was limited to accumulating expense information and that it did not extend to assembling appellant's income data.[7] But the record suggests otherwise. Whatever his precise responsibilities, he did engage to some extent in preparing income information for appellant's return. He advised Muskrat

---

6. "A. I cannot recall when I commenced [sic] to do it. The situation came about partly because of the expanding scope of the operations of Mr. Black.

There were quite a few more companies involved during 1957 than there were in 1956. I was not satisfied with the manner in which I had put in [sic] 1956 or the 1957 return together. It was more or less a developing thing.

"Q. Mr. Muskrat, why were you not satisfied with the manner you put the '56 return together, or the '57 return?

"A. Well, I thought that things should

have been kept a little more precisely than they had been for those two other years. However, those two years were gone."

7. He later softened that assertion.

"Q. Were you ever, during the time of the preparation of these returns, or at any time for the years 1956, 1957, and 1958 responsible for the collection of information pertaining to the income for the returns for Mr. Black?

"A. I had some measure in it, but I didn't have the responsibility."

on the treatment of various receipts. On at least one occasion he wrote the appellant to obtain information about his receipts. Furthermore, since he was responsible for the Blyco Corp. tax returns, which included allocating income between the overlapping activities of appellant and Blyco, any failure by Baird to consider appellant's receipts seems improbable. There is correspondence between Baird and the appellant designating specific sources of income as belonging to the corporation. That letter, in March, 1958, clearly shows Baird's participation in the reporting of appellant's income. The letter concerned appellant's estimated declaration of taxes for 1958; in it, Baird reviewed appellant's income (based on certain assumptions) and outlined two methods for arriving at the estimated declaration. The inference is clear that Baird's participation with Muskrat in the preparation of appellant's tax returns was not limited to expenses. Rather, the conclusion suggested is that Baird was overseeing all of Muskrat's performance.

From this testimony, very little appears either to support or to refute appellant's testimony that information as to every receipt was passed to Baird in Joplin. Muskrat's testimony suggests that there was no such reporting, or at least that the manner of doing so was so disorganized as to have been of no assistance to him. Even the expense deductions, for example, could not be completed without obtaining information from the appellant. Baird, the central figure in this controversy, was not questioned about the adequacy of the information that he received from the appel-

lant, although he did state that what he received was made available to Muskrat and that he did not know of many of the specific transactions that were unreported. That Baird did know generally of the appellant's compensation arrangements and did know that some of appellant's receipts were not reported on the tax returns, of course, does not necessarily mean that appellant told Baird of his receipts. Equally reasonable is the explanation that Baird acquired such information in the course of other duties on behalf of the appellant.

This raises critically the question of appellant's reliance on Baird and Muskrat. How is Baird's failure to ensure the accuracy of appellant's return, in light of his knowledge of the unreported receipts, to be understood? That he was negligent is belied by the fact that during this same period the accounting for Blyco proceeded in a more orderly fashion. Counsel for the appellant suggests that perhaps Baird's behavior can be attributed to his self-interest in seeing that Blyco Corp. obtained the benefit of appellant's deductions. This allegation, however, is supported only by some evidence that the deductions on Blyco's returns increased in 1958 while those of appellant diminished. Furthermore, no glimmer of such behavior emerged from Muskrat's testimony, and he was preparing the returns for both parties.

For some reason, Baird did not think it necessary to report the receipts that were not reflected on 1099 forms.[8] Apparently, this was not a decision based upon Baird's understanding of the reporting requirements.[9] In any event, the

8. It is not disputed that the unreported receipts were not shown on any W-2 or 1099 form. As to the income that was reported, Muskrat testified that he did not remember whether he saw 1099 forms in 1956, but that he did obtain some oral information from Baird or appellant and that he did have W-2 forms. He stated that he did not know where the income information for the 1957 returns came from if it was not from the 1099 forms. The 1958 return was clearly based

on income shown on the forms. Muskrat said he used the forms because he was unable to reconcile the amount with the sum recorded in his books. Baird testified that Muskrat relied on the 1099 and W-2 forms in reporting the appellant's income for the years in question.

9. Counsel for the appellant contends that Baird and Muskrat had good and sufficient reasons of their own for not including the unreported checks in the returns, and tried to show that the reason was Baird's

inference seems reasonable that, in this matter, appellant placed something less than total reliance on Baird and that appellant was not unaware of the omission of substantial receipts from his tax returns.

The record below does not show appellant to be unconcerned with the preparation of his tax returns. To the contrary, he personally participated to a considerable extent in their preparation. In 1956 he was present while the returns were prepared, assisting by examining his bank statements to locate deductible items. Other returns were not completed without obtaining his advice on various expense deductions. Appellant was well aware of the tax implications of his compensation arrangements, to the extent of demanding that the amounts paid him for expenses be not reflected on 1099 information returns because it would burden him with a higher tax.[10]

Nor does appellant's characterization of Baird as the person with complete responsibility for the financial aspects of his business appear strictly accurate. Expense checks were frequently mailed directly to the appellant, by-passing the Joplin office. Other checks, at appellant's request, were made payable to and sent directly to the hotels appellant was using. Often appellant would request additional money from his employers, and on at least one occasion he complained about delinquent payments. When this is added to his previously established concern that expense money be not reported on 1099 forms and his obvious awareness and control of the financial arrangements he made, the conclusion that appellant was quite the master of his own business seems thoroughly justified.

From this evidence, a jury could certainly infer that the accountant, Muskrat, did not have adequate information. Whether the appellant notified Baird of all of his receipts is perhaps less clear. The reporting to Baird occurred, if at all, in an informal manner, and its completeness is left very much in doubt by the record. Few indicia of any regular method of reporting are present. Checks and letters regularly by-passed the Joplin office. The accountant who was supposed to have access to these materials gave credible testimony of never having seen the items. Indeed, the construction of the returns themselves suggests a lack of information.

Furthermore, it could reasonably be inferred that appellant, contrary to his own testimony, did not rely completely upon the judgment of Baird and Muskrat. Rather, he appeared to have considerable appreciation for the income tax implications of his activities. His correspondence with Baird suggests that Baird would not make such a decision without consulting appellant. Finally, appellant's participation in the preparation of the returns suggests that Baird and Muskrat did not possess the responsibility he attributed to them.

It may be that some or all of the unreported receipts were not retained by appellant for his personal benefit in the ordinary sense. One engaged in his business has perhaps to face some delicate problems of identification and characterization in the itemization of expenses. It may not be possible to serve both client and Commissioner at the same time. But, if it is the latter who is sacrificed, that choice is no less knowing and wilful because of the harsh dilemma which occasions it. We think this record was

understanding of the reporting requirements. Although Baird stated, in testimony that was later struck, that it was his understanding that such items need not be reported, he was positive in his testimony that he was not a tax lawyer and did not give appellant legal advice about his income tax.

10. On another occasion, appellant wrote Howard Foundry for payment requesting

that it not be shown as income to him. Correspondence with Aeronca concerning appellant's compensation arrangement was explicitly concerned with a "better tax deal." Appellant's insistence on operating on a reimbursement of expense basis is further evidence of his tax conciousness.

such as to enable a jury to feel free of reasonable doubt in its conclusion that appellant made a wilful decision to ignore his responsibilities under the federal income tax law.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge (dissenting):

The evidence introduced by the Government in an attempt to show understatement of income in Black's returns for the years in question was so cloudy, and proof of criminal intent on his part was so conspicuously absent, that I am unable to join the majority in affirming his conviction. I think the trial judge should have directed a verdict of acquittal.

Baird, who had long been Black's attorney, and Muskrat, his young and inexperienced accountant, prepared the returns, with very little, if any, participation by Black. Yet they were the principal witnesses against him, probably because, as Baird admitted, a special agent of the Intelligence Division of the Internal Revenue Service threatened him with criminal prosecution if he did not cooperate. Whether Muskrat was similarly threatened does not appear.

Black's files were kept in Baird's office in Joplin, Missouri, where he and Muskrat had full access to them. In preparing the returns, Muskrat selected from the files the materials he thought he would need, but in many instances he relied upon forms W–2 and 1099 without attempting to verify them by comparing them with information contained in the files. He admitted that he could not say the transactions about which he was questioned on direct examination were not represented by some documentation in the files.

Muskrat also testified that on form 1099 there were seven categories of payments to be listed by the payor, but there was no category for expense advancement or reimbursements. Obviously, the payor's inclusion of the latter two items in form 1099 would cause the form to reflect a greater sum than that paid by way of compensation only. Muskrat said when the 1099's and W–2's for 1958 totaled more income for Black than the books showed, he looked no further. If the total had been less, he said he "would have done some more checking." This is indicative of Muskrat's inexperience.

In spite of the possibly coerced cooperation of Black's two associates, the evidence permits, if it does not actually require, the conclusion that Black gave Baird, or the latter otherwise had, full information about his income, and that any understatement of income was due to the negligence of Baird and Muskrat. The record also rather definitely shows, I think, not only that Black had no real part in the preparation of the returns and depended on his attorney and accountant, but also that he had at the beginning instructed them to prepare true and accurate returns.

For example, Muskrat testified that Black told him when he began his work that his affairs were complex, that he was seldom in Joplin to assist in preparing his returns, but wanted them to be as correct as possible. To that end, Muskrat said, Black asked him and Baird to go to Kansas City to consult the Internal Revenue Service to be sure they were preparing the returns correctly. The trip was never made because Baird decided not to go.

It is significant that Muskrat said Black never told him to omit any item of income from his tax return. He testified that he depended on Baird for information and that he saw Black only a few times. And Baird admitted he told Black the amount of his income and his estimated tax, thus showing the latter had no part in the preparation of the returns.

In the circumstances, I think it quite clear that the Government failed to show Black had knowledge of or participated in making any understatement of income for the years under consideration. If there was an understatement, Black is liable for the tax deficiency caused thereby; but he should not be punished

criminally for the acts of his subordinates of which he knew nothing. Black was clothed with the presumption of innocence and, in my view, it was never dispelled by proof of guilt beyond a reasonable doubt. Absent evidence of any criminal act on Black's part, the jury should have been instructed to find him not guilty. United States v. Pechenik, 236 F.2d 844 (3rd Cir. 1956).

In any event, I am convinced that the trial court erred in denying a defense motion for a mistrial because of inflammatory newspaper articles which had just appeared. It is significant, I think, that the jury which had been allowed to separate until the motion for a mistrial was made, was thereafter held together on the court's own motion. This indicates to me that the trial judge was disturbed by the articles in the papers. And well he might have been. I think the motion should have been granted. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

For these reasons, I dissent.