HOLLAND   v.   UNITED STATES.

HOLLAND   v.   UNITED STATES.

Nos. 4684, 4685.

United States Court of Appeals
Tenth Circuit.

Jan. 21, 1954.

Rehearing Denied Feb. 5, 1954.

**518**

Frank A. Bruno, Denver, Colo. (H. D. Reed and Anthony F. Zarlengo, Denver, Colo., were with him on the brief), for appellants.

Clifford C. Chittim, Boulder, Colo. (Charles S. Vigil, Denver, Colo., was with him on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Marion Holland and Ethel Holland, husband and wife, separately appeal from a judgment and sentence on jury convictions for willfully attempting to defeat and evade their income tax liability for the calendar year 1948, in violation of Section 145(b), 26 U.S.C.A.

The first count in the indictment charged the husband with violations of 145(b) for the calendar year 1946, by filing or causing to be filed in the District of Colorado, a false and fraudulent return, wherein he stated that his net income for the said calendar year was $15,336.93 and that the amount of the tax due and owing thereon was $3,980.-39, when, as he well knew, his net income for the said year was $38,471.03, upon which net income he owed a tax of $15,688.75.

The second count charged the husband with violations of Section 145(b) for the calendar year 1947, for filing or causing to be filed in the District of Colorado a false and fraudulent return, wherein he stated that his net income for the said year was $5,717.57 and that the amount of tax due and owing thereon was $851.-74, when, as he well knew, his net income for the said year was $34,631.97, upon which net income he owed a tax of $13,846.99.

The third count of the indictment, upon which both the appellants were convicted, charged them with violations of Section 145(b) by filing or causing to be filed in the District of Colorado a false and fraudulent return for the calendar year 1948, showing income of $11,211.42 with a tax of $1,532.52, when, as they well knew, their true net income for such year was $29,948.16, upon which they owed a tax of $7,518.88.

The husband was acquitted on the first two counts of the indictment, and the evidence relating to those two counts is relevant only insofar as it bears upon the charge in the third count, upon which the appellants were convicted and sentenced.

The returns for each of the prosecution years were prepared by a tax accountant from books and records kept by him from information furnished by appellants. There is no contention that the returns do not accurately reflect all of the income shown on the books and records maintained by the taxpayers in the course of their business as owners of a hotel and restaurant in Golden, Colorado. There is no direct proof of any specific unreported item of income or undisclosed sources of income, or that any items of expense claimed as deductions were not legitimate and allowable. The government's case rests solely on the circumstances of increased net worth established by record purchases and expenditures during the prosecution period to prove a substantial understatement of taxable income for those years. And,

the first contention of the appellants is that the government failed to prove with sufficient accuracy the net worth of appellants at the beginning of the prosecution period.

Relying primarily upon Bryan v. United States, 5 Cir., 175 F.2d 223; and United States v. Fenwick, 7 Cir., 177 F.2d 488, appellants take the position that to prove a prima facie case based on increased net worth and expenditures, the government must produce evidence which excludes or tends to exclude all other available sources from which the increased net worth and expenditures could have been derived. It is of course incumbent upon the government to prove to a reasonable degree of accuracy the net worth of the taxpayer at the beginning of the prosecution period, otherwise there could be no foundation for the hypothesis that the established increased net worth represented unreported current income. But, the "government is not required to prove a negative or to refute all possible speculation" as to the source of increased net worth. Gariepy v. United States, 6 Cir., 189 F.2d 459, 463; see also Schuermann v. United States, 8 Cir., 174 F.2d 397; Leeby v. United States, 8 Cir., 192 F.2d 331. One bent on income tax evasion cannot be expected to make a record of his unreported income. indeed, the disposition is toward concealment. The government is not required to go beyond records reasonably available in order to foreclose any permissible inference that the unexplained excess expenditures in any taxable year were derived from sources other than current income. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546.

From records and information available to it, the government fixed a net worth for the appellants as of January 1, 1946 in the sum of $19,152.59, consisting primarily of a checking account and common corporate stocks. From record purchases and expenditures in the year 1946, the government showed an increased net worth for that year in the sum of $57,410.94, and by the same method determined an increased net worth of $33,790.25 for the calendar year 1947 and $33,011.72 for 1948. These net worth increases established a taxable income substantially in excess of the reported income for the respective years on which a substantial additional tax would be due and payable.

As a part of its proof of opening and increased net worth of the taxpayers, the government investigator testified from sworn statements of the appellants made in connection with the investigation, and introduced in evidence by the appellants. In those statements, the husband stated that the excess expenditures for the years in question represented their lifetime savings, accumulated prior to 1946; that on January 1, 1946, he had a net worth of $156,000.00 or $157,000.00, consisting of $104,000.00 in currency, mostly one-hundred-dollar bills, all of which he earned and accumulated prior to December 22, 1933; $9,000.00 earned between 1933 and 1946, $4,000.00 by himself and $5,000.00 by him and his wife. The remainder of the accumulated funds was in corporate stocks. With respect to the $104,000.00 in currency, he stated that he had $20,000.00 when he was drafted into the army for the First World War, and that after discharge and in the Twenties, he speculated on the stock market and in real estate; and operated, bought and sold restaurants, one of which he sold three different times at a profit of $15,000.00; that when, in 1933, the restaurant business became unprofitable and he was unable to pay his debts, he just closed up and told the mortgagee to take over—"I just gave him the setup for what I owed him"; and that at that time he or his wholly owned corporations owed approximately $35,000.00 in unpaid bills. He further stated that immediately after closing his restaurant business, he sold vacuum cleaners for about six months, and then went to Casper, Wyoming, where he worked as a chef in a hotel for seven years for $175.00 a month and living quarters. During all of this time his wife and son remained in Denver for

economic reasons, and his wife worked as a secretary. Upon returning to Denver in 1941, he worked as a chef in a restaurant there, later went to Orange, Texas where he also worked as a chef, thence to Billings, Montana, and back to Colorado where he was employed as a chef in the hotel which he purchased in the Spring of 1946. During all of this time, he stated that he kept the $104,-000.00 in currency in a sack or metal box in his room or wherever he happened to be living; that only his wife knew of the funds; that he never invested or deposited the money any place at any time until he decided to purchase the hotel in Golden, Colorado in 1946, whereupon from time to time he deposited funds in the bank sufficient to cover the checks he wrote for the expenditures which the government contends represented current income.

[2] In addition to the sworn statement of appellant, the government introduced evidence tending to show that in 1933, when he went out of business, he was unable to pay his rent; that his creditors were threatening to sue him for his unpaid bills, and at least one judgment was rendered against him and his corporation. A dairy bill incurred prior to cessation of business in 1933 was compromised in 1946 for $2,500.00. He defaulted on $10.00 per month installment payments for furniture purchased in 1933. Correspondence introduced in the record showed that in 1928 and 1929, he was pleading with his creditors not to bring suit or to insist upon payment in order to avoid bankruptcy. The appellants objected to the introduction of this correspondence and contend on appeal that it is too remote and was written in behalf of a separate corporate entity. But, we think it had an admissible bearing on the question of his opening net worth, especially in view of his asserted affluence at that time.

The government introduced the appellant's income tax record in Colorado from 1913 to 1933 to show that he reported no taxable income during the time he claimed to have been accumulating his currency assets. The government also introduced, over the objection of appellants, copies of certificates of assessment and payment of income taxes for the years 1933 to 1941, to show that during the husband's residence in Wyoming, he paid only nominal income taxes. The certificates were on a prescribed form of the Treasury Department and directed to the Intelligence Unit of the Internal Revenue Service at Denver, Colorado. They were signed by the Director for the State of Wyoming, who, as legal custodian of the official records of the United States Bureau of Internal Revenue for the State of Wyoming, certified that the transcript of the accounts of the taxpayer was true and complete for the period stated; that all assessments of tax, penalty and interest were shown therein; and that after diligent search, no record or entry appeared on his records except as therein indicated. The exhibits were produced in court by a witness who did not make them and had no personal knowledge of their contents. The appellants claim reversible error for the admission of these exhibits on the grounds that they were admittedly false and incorrect upon their face and not properly authenticated.

The government also introduced in evidence the appellant's income tax return for the year 1944 filed in Montana and his income tax return for the year 1945 filed in Colorado, apparently to show reported income for those years. The tax assessment list in the State of Montana for the years 1946 and 1947 were also admitted in evidence for the same purpose. The appellants complain of the admission of the income tax returns and of testimony by a special agent of the Bureau who referred to them, on the grounds that the documents were not properly authenticated, and not having custody or personal knowledge of the contents of the records, his testimony based thereon was hearsay. Objection was made to the admission of the assessment lists from the State of Montana because not properly certified. The special agent who produced them did not

prepare them or have official custody of them, nor did he have personal knowledge of their content. But, he did testify that the proffered exhibits were of the official records of the Bureau of Internal Revenue for the State of Montana, certified by the Director, and by him directed to produce the same in court.

Each and all of these exhibits are official records of a department of the United States, and they are admissible under Section 1733, 28 U.S.C.A. "to prove the act, transaction or occurrence as a memorandum of which the same were made or kept." And, they were also admissible to show the absence of any record or entry of a relevant act, transaction or occurrence. See Rule 44 (a, b), Federal Rules of Civil Procedure, 28 U.S.C.A., made applicable by Rule 27 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. See also Wong Wing Foo v. McGrath, 9 Cir., 196 F.2d 120; Clinton Co. v. Commissioner of Internal Revenue, 7 Cir., 159 F.2d 102; Moore's Federal Practice, 2d Ed., Vol. 5, Sec. 44.02; Wigmore on Evidence, 3d Ed., Vol. V, Secs. 1638, 1638a and 1639.

■ Appellants call attention to the husband's statement to the investigator to the effect that their greater purchases of corporate stock "were still on hand in 1946"; and assert that in determining their net worth as of January 1, 1946, the government failed to give them credit for the value of corporate stocks held at that time. In reconstructing the gross income for the year in question, and for that purpose determining net worth on January 1, 1946, the government credited appellants with the ownership of corporate stocks with a value of $29,650.00. In his 1946 return, appellant's capital gain schedule reflected the sale in February 1946 of stocks acquired in 1943 and 1945 at a cost of $29,650.00 for $52,142.78, or a net capital gain of $10,-968.44. The representative of the bank where the stocks were pledged for loans testified that all the stock pledged for collateral was liquidated or withdrawn early in 1946, and thereafter all other loans were secured by deeds of trust. Subsequent returns for the period in question did not reflect the sale of any stock. If, therefore, any stocks remained unsold in 1946, they must be assumed to have remained in his custody and could therefore have no bearing on his net worth as established by purchases and expenditures.

■ Appellants also complain of the government's computation of net worth on the basis of the cost of the stock owned by appellant on January 1, 1946 in the sum of $29,650.00 instead of its market value or sale price of $52,142.00. In reconstructing appellant's income tax liability for 1946, the government listed the stock at cost, and when, in 1946, it was liquidated, it ceased to be an item of net worth. The nontaxable capital gain in the sum of $10,968.44 was subtracted from the total funds expended in arriving at the adjusted gross income; and the taxable one-half of the capital gain was deducted from gross income to arrive at net income tax liability. By this method, we think the taxpayers were given full credit for the value of their stock at the beginning of the prosecution period.

■ The point is also made that the government has failed to establish the opening net worth of the wife, but the evidence shows that if she did in fact have earnings, they were included in the hoard of currency the husband claimed to have had in his possession on January 1, 1946.

■■ The appellants earnestly contend that the government has failed to establish any tax liability for the year 1948 over and above the amount paid. For the calendar year 1948, appellants reported a taxable income of $11,211.42 on which they paid a tax of $1,532.52. On the basis of the government's established net worth as of January 1, 1946, as projected through 1948, the appellants realized an increased net worth of $33,011.72, or unreported income of $20,885.74. Taking the government's net worth computations on their face, it be-

comes plain that the appellants showed a substantial additional income tax liability for the taxable year 1948, even after credit for unclaimed depreciation and capital expenditures during that year. It is not incumbent upon the government to prove the exact amounts of the unreported income, it is sufficient to show that it was substantial and willful. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. Rosenblum, 7 Cir., 176 F.2d 321, 330; Graves v. United States, 10 Cir., 191 F.2d 579; Jelaza v. United States, 4 Cir., 179 F.2d 202. If the appellants did not have the $104,000.00 in currency on January 1, 1946, which they claim represented the excessive expenditures during the prosecution period, the evidence is entirely sufficient to show a substantial understatement of income for the calendar year 1948. If, however, the expenditures were derived from cash on hand January 1, 1946, it is entirely sufficient to absorb and explain the excessive expenditures. We think the evidence presented an issuable fact for the jury.

Turning to the instructions, appellants claim that the court failed to instruct the jury upon the section of the Act which forms the basis for the indictment or upon the essential element of the crime charged; that it erred in its instructions to the jury on the law of reasonable doubt and circumstantial evidence; and that it committed reversible error in defining the issues for the jury, as well as requisite proof to establish tax evasion by the net worth expenditure method.

■ The substance of each count in the indictment was recited to the jury and it was informed that by appellants' pleas of not guilty, every essential element of the crimes charged in the indictment was placed in issue and the burden was upon the government to produce evidence to satisfy the minds of the jury beyond a reasonable doubt of the existence of every one of those material and essential elements of the crime charged by the grand jury; and

that if the government failed, it was the duty of the jury to acquit the appellants. Alternatively, the jury was told that if the government produced evidence which satisfied their minds beyond a reasonable doubt of the existence of the elements of the offense, it would be their duty to return a verdict of guilty against the defendants. True, the court did not recite the statute or make reference to it in his instructions, but the offense charged is embodied in the indictment and a recitation of the statute involved is not a necessary part of the offense charged. Kahle v. United States, 10 Cir., 204 F.2d 864. Each count in the indictment, and especially the third, charged an offense to evade and defeat income tax liability in violation of federal law. The substance of the indictment was given to the jury in language too clear for doubt.

The jury was told that "beyond a reasonable doubt" did not mean beyond every doubt or leaving no doubt at all, but a doubt based upon reason and common sense in the exercise of the jury's intelligence; that it meant a "substantial doubt, not a trivial doubt; a significant doubt, not a flimsy one; a real doubt and not an imaginary one." Appellants specifically object to that part of the court's instructions which went on to tell the jury that reasonable doubt meant that kind of a doubt which "you folks in the more serious and important affairs of your own lives might be willing to act upon" and that if they felt "such a doubt" about the government's case, they should acquit the defendants. This latter part of the instructions is said to improperly define a doubt upon which the jurors would act "rather than to pause and hesitate before acting."

■ There are many definitions of "reasonable doubt". Some courts assert that the words themselves carry their own best definition and that any attempts at clarification or definition tend only to confuse an otherwise simple phrase. See 20 Am.Jur.Evidence, Sec. 1257; 53 Am.Jur.Trial, Sec. 751; 36 Words & Phrases, Reasonable Doubt, pp.

297, 319; Wigmore on Evidence, 3rd Ed., Vol. IX, Sec. 2497. Under the federal rule, however, the accused is entitled to a definition of the term "reasonable doubt", and failure to instruct upon request has been held to constitute error. Nanfito v. United States, 8 Cir., 20 F. 2d 376; Blatt v. United States, 3 Cir., 60 F.2d 481; Egan v. United States, 52 App.D.C. 384, 287 F. 958; Mundy v. United States, 85 U.S.App.D.C. 120, 176 F.2d 32; Schencks v. United States, 55 App.D.C. 84, 2 F.2d 185. But, a proper definition of the term does not depend upon the observance of a ritual or the use of precise words found in some accepted definition. United States v. Schireson, 3 Cir., 116 F.2d 881, 132 A.L.R. 1157; United States v. Stoehr, D.C., 100 F.Supp. 143, affirmed, 3 Cir., 196 F.2d 276. It is sufficient if the jury is given to understand that reasonable doubt as applied to the measure of its persuasion means a real or substantial doubt generated by the evidence or a lack of it; and that beyond a reasonable doubt means to a reasonable or moral certainty. Wigmore, supra, Sec. 2497.

■■■■ While the court's definition of "reasonable doubt" may not be a model of clarity and conciseness, we think it does suffice to convey the legally acceptable meaning of the term.

■■■■ The jury was repeatedly admonished that the government's case was based upon circumstantial evidence and that before they could convict the appellants, they must believe that evidence beyond a reasonable doubt. In that connection, they were told to use their common sense in determining what inferences might reasonably be drawn from the circumstances which they thought were established by the proof. While circumstantial evidence was not defined in time-honored terms that it must be consistent with guilt and inconsistent with any other hypothesis, we do not think the court left any doubt in the minds of the jury of the nature of the proof or how it should act upon it. Again, there are no "inexorable formulas on the subject; it is enough that the judge shall in substance tell the jury that they must be satisfied beyond any reasonable chance of mistake." United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, 234. This, we think, the court did in satisfactory, if not ritualistic terms.

■■■■ The court was at pains to define the issues for the jury. With commendable clarity, the court gave the jury the theory of the government and generally referred to the circumstantial evidence of the government in support of that proof, at the same time cautioning the jury that it was the judge of the evidence, as well as the weight and credibility of the witnesses. After relating the appellant's theory or defense, the jury was told in substance that they should determine whether or not the defendants knowingly and willfully failed to include gross receipts from their business which the government claimed they earned and did not report for the taxable years in question. It was instructed that the government's case was based upon the theory that the defendants did not have $104,000.00 on January 1, 1946, and that the increases in their net worth for the years in question were the result of purchases from earnings in the taxable years in question from their business.

We agree with the trial court that the ultimate and precise issue in the case was whether they believed beyond a reasonable doubt from the established circumstances that there was no such fund in existence on January 1, 1946. If they didn't believe the appellants' explanations, they were justified in concluding beyond a reasonable doubt that the excessive expenditures were derived from current earnings. These instructions framed the triable issues in the case. Guilt or innocence turned on a resolution of those issues and they were properly presented to the jury.

■■■■ Finally, appellants complain of the government's use of certain charts in the closing argument to the jury. These charts purported to graphically show the government's case based upon

its version of the evidence. Most of the data on the charts were taken from the evidence. Ultimately it was for the jury to determine whether they truly portrayed the evidence. Their use was no more than an argument which the jury was of course free to reject or accept in its discretion. We can find no error in their use.

The judgments are affirmed.