**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George LAWSON, Defendant-**
**Appellant.**

**No. 74–1134.**

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1974.

Decided Nov. 26, 1974.

Rehearing Denied Dec. 19, 1974.

Certiorari Denied March 31, 1975.
See 95 S.Ct. 1446.

Carl M. Walsh, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and Walter Jones, Jr., Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice (Retired)*, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The defendant George Lawson was convicted by a jury of importing and conspiring to import cocaine into the United States, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 952(a) and 963. Lawson raises a number of issues on appeal, including: (1) whether the defendant was prejudiced by a display of cocaine which was not admitted into evidence; (2) whether the indictment was invalid because the Grand Jury which returned the indictment was the third Special Grand Jury in existence at that time in the Northern District of Illinois; (3) whether the evidence was sufficient to prove Lawson guilty beyond a reasonable doubt; (4) whether the district court erred in instructing the jury; (5) whether there was a lack of jurisdiction and venue in the Northern District of Illinois; (6) whether the defendant was prejudiced by certain statements of witnesses and the prosecutor; and (7) whether there was a variance between the evidence and the indictment.

The evidence, taken in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), established the following significant conduct.[1] In April 1971, Richard Fox, Randy Fine, and Larry Zaretsky traveled to Jamaica. While there, they met George Lawson who was living in Jamaica. During a visit to Lawson's home, the defendant stated that he had a supply of cocaine

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. The pattern of confusing and complex movements and interrelations frequently found in narcotics trafficking cases existed in the present case. We have not attempted to set forth a "blow-by-blow" summary.

for sale and asked if Fox was interested in purchasing any. After discussing Lawson's offer with Zaretsky and John DeCarolis, Fox told Lawson he was interested in buying the cocaine but that it would have to be delivered to Chicago and payment would not be made until it was delivered. Lawson subsequently informed Fox that the deal was acceptable to him and that Lawson's girl friend, Myrna Pierce, would personally deliver the cocaine to Chicago that weekend. In return for the cocaine, Lawson was to receive $4,500 a pound plus a percentage of the profits.

Before leaving Jamaica, Fox again visited Lawson's home, where he saw Lawson packing a white powder into a cosmetic bag. Lawson gave this bag and two clear plastic bags, also containing white powder, to Myrna Pierce and instructed her to take them to Chicago.

Fox then flew to Chicago. Zaretsky flew to Miami, Florida, picked up Fox's car, and drove it to Chicago. Myrna Pierce flew to Chicago by way of Baltimore and, upon arriving in Chicago, she telephoned Randy Fine. Fine, accompanied by another man, picked up the packages from Pierce's hotel room. The following day, Fox and Zaretsky gave Pierce an envelope containing $5,000. Pierce then flew back to Jamaica and gave the envelope to Lawson.

After Pierce had been paid, Fox, Zaretsky, DeCarolis, and David Bennett met at an apartment in Chicago. At that time, the powder from the cosmetic bag was mixed with lactose and placed in one-ounce bottles and one-pound containers.

A few days thereafter, Zaretsky sold a one-ounce bottle of white powder, which he had obtained from Fox, to Special Agent Aldo Aurilio for $1,000. The following day, Zaretsky sold Aurilio another larger package for $11,000.

Approximately two weeks after these sales to Aurilio, Fox withdrew $10,000 from a bank and gave it to David Bennett with instructions to deliver it to Lawson. Bennett and his girl friend Linda Vasquez then flew to Jamaica. Lawson told Myrna Pierce that "Rick had sent [Bennett and Vasquez] down with the balance of the money."

I

The evidentiary part of Lawson's trial lasted less than two days. During the morning of the second day of the trial, two Government witnesses, Special Agent Aldo Aurilio and Mark Cunningham, a Government chemist, testified. In substance, Aurilio testified that on two separate occasions, Zaretsky sold him packages of white powder which were identified as Government Group Exhibits 1 and 2. Cunningham was qualified as an expert witness and testified that the powder contained in the exhibits was cocaine. During Aurilio's and Cunningham's testimony, the exhibits, purportedly containing more than a pound of cocaine, were on the prosecution's table in front of the jury.

At the conclusion of this testimony, the district court sustained the defendant's objection to the admission of the exhibits on the ground that the Government had failed to connect the exhibits with Lawson. The district judge also struck the testimony of both Aurilio and Cunningham and instructed the jury to disregard that testimony and the exhibits. The court, however, denied Lawson's motion for a mistrial. The defendant contends that the district court erred in denying this motion for a mistrial since Lawson was prejudiced by the testimony of Aurilio and Cunningham and by having the exhibits of cocaine before the jury.

As this court has noted, there are situations in which the display of evidence which is later ruled inadmissible constitutes reversible error. United States v. Heft, 413 F.2d 1027 (7th Cir. 1969); United States v. Reid, 410 F.2d 1223 (7th Cir. 1969). However, we have also recognized that not all such displays require reversal. United States v. Holmes, 452 F.2d 249 (7th Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L. Ed.2d 479 (1972); United States v. Cat-

alano, 450 F.2d 985 (7th Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 980, 30 L.Ed.2d 802 (1972).

In *Catalano*, where the defendants were charged with unlawful possession of property (television sets) stolen in interstate commerce with knowledge that the property was stolen, Government witnesses identified two guns found at or near the scene of a gunfight which had occurred between police and the defendants at the time of the defendants' arrest. The trial court, finding that neither gun had been connected to any of the defendants, refused to admit the guns into evidence and struck all testimony with respect to the guns. The trial court, however, denied the defendants' motion for a mistrial. This court held that the district court's cautionary instruction was adequate to protect the defendants from any possible prejudice and that the court properly denied the motion for a mistrial. In particular, this court noted that the defendants had failed to object to the initial display of the guns to the jury and that, even if a timely objection had been made, the defendants were not prejudiced by the display of the guns since there had been other testimony concerning the fact that a gunfight had taken place.

As in *Catalano*, the defendant in the present case did not object to the initial display of the cocaine.[2] Moreover, the testimony of Aurilio was merely cumulative in that Zaretsky had testified about the sales of packages to Aurilio. The defendant did not dispute that these sales had taken place. In addition, the jury had heard extensive and undisputed testimony regarding Lawson's role in in-

itiating the sale to Fox and in directing Myrna Pierce to bring the substance to Chicago. We also note that the district judge admonished the jury during the trial to disregard the exhibits and the testimony of Aurilio and Cunningham. In its final instructions, the court again told the jury to consider only properly admitted evidence in reaching their verdict. See United States v. Catalano, *supra*; United States v. Holmes, *supra*. Finally, we note that there is no indication that the Government was acting in bad faith in presenting the testimony of Aurilio and Cunningham or in seeking to have the exhibits admitted into evidence. United States v. Lyon, 397 F.2d 505, 512 (7th Cir. 1968), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117.

■ In the context of the entire trial, we conclude that reversible error was avoided by the district court's action in striking the testimony and instructing the jury to disregard both the testimony and the exhibits.[3] United States v. Holmes, *supra*.

Our decision is not contrary to this court's opinions in United States v. Heft, 413 F.2d 1027 (7th Cir. 1969), United States v. Reid, 410 F.2d 1223 (7th Cir. 1969), and United States v. Kwitek, 433 F.2d 18 (7th Cir. 1970). As we pointed out in *Catalano*, in all three of those cases, the prejudicial evidence was found in the possession of the defendant.

## II

■ The defendant next contends that the indictment against him was invalid because the Special September

---

2. The defense had a standing objection to all testimony regarding conversations and events outside the presence of the defendant. The defense, however, did not object to the display of the cocaine on the prosecutor's table. The use of standing objections while perhaps facilitating the orderly uninterrupted presentation of testimony is, by its lack of articulation, not designed to point out particular errors to a trial court. Certainly a standing objection should not be given broader scope than is found in its establishing statement.

3. The defendant contends that "the prejudice resulting from the exhibition of a large amount of narcotics in a narcotics case is obvious and always incurable." We reject such a *per se* rule which could only be based upon speculation. It could also be argued conversely to the position of the defendant that the jury would be prejudiced against the prosecution for attempting to influence them by showing them drugs which the trial judge said had no place in the case before them.

1972 Grand Jury, which returned the indictment, was the third such special grand jury then in existence in the Northern District of Illinois.[4] This argument is without merit. As this court has recently noted:

> "The legislative history of the Organized Crime Control Act of 1970 indicates that the Special Grand Jury was created as an instrument to investigate organized crime in areas where such criminal activity was evident. It would thwart the purpose of the Act to limit to two the number of Special Grand Juries in a district when in fact four or five were necessary for adequate investigation of organized crime. Korman v. United States, 486 F.2d 926, 934 (7th Cir. 1973) (footnote omitted).

■ Lawson argues that the statement in *Korman* is dicta and further that *Korman* involved an attack by a witness who would have had no standing to attack the grand jury, and that, therefore, we should not follow the explicit language quoted above. While it may be, as Lawson contends, that the special grand jury in *Korman* was in fact the second special grand jury impaneled in the district and therefore clearly permissible by the terms of 18 U.S.C. § 3332 (b), and assuming that the defendant here has requisite standing for the attack, we nevertheless, upon reconsideration of the statute, are of the opinion that the subsection of the statute does authorize an additional special grand jury to be impaneled whenever the volume of business is determined by the district court to require it.

We agree with the appellant that ordinarily "an" is to be equated with "one." However, "an" is an article having a generalizing or indefinite force as opposed to the specifying or particularizing effect of "the." United States v. Hudson, 65 F. 68 (W.D.Ark.1894).

"An" does not have the same connotation of limitation as does "the." Brooks v. Zabka, 168 Colo. 265, 450 P.2d 653, 655 (1969).

If the intent had been to limit additional special grand juries to one only, that intent could have been easily and explicitly stated. It was not and we decline to read in the limitation. Such a limitation would have been an artificial one and as stated by Judge Duffy in *Korman* thwarting of "the purpose of the Act."

### III

Lawson asserts that the evidence was insufficient to support the jury's verdict on either the substantive count of importing or the count of conspiring to do so.

With respect to the substantive count, the defendant asserts that the Government failed to prove that the substance imported was actually cocaine. When the defendant is charged with a substantive violation of the narcotics laws, the jury, in order to find the defendant guilty, must be convinced beyond a reasonable doubt that the substance imported was in fact a narcotic drug. United States v. Agueci, 310 F.2d 817, 828 (2d Cir. 1962). However, it is not necessary that this be proved by direct evidence. "Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics." United States v. Agueci, *supra* at 828. See also United States v. Atkins, 473 F.2d 308, 314 (8th Cir. 1973).

■ In the present case, there was sufficient circumstantial evidence from which the jury could have inferred that

---

4. 18 U.S.C. § 3332(b) provides:
"Whenever the district court determines that the volume of business of the special grand jury exceeds the capacity of the grand jury to discharge its obligations, the district court may order an additional special grand jury for that district to be impaneled."

the material imported was cocaine. Both Myrna Pierce and Fox testified that the substance which was packed into the cosmetic bag was a white powder. See United States v. Atkins, *supra* at 314; Toliver v. United States, 224 F. 2d 742, 745 (9th Cir. 1955). Both Fox and Pierce testified, moreover, that Lawson spoke of selling "cocaine." See United States v. Agueci, *supra*, 310 F.2d at 829; Toliver v. United States, *supra*, 224 F.2d at 745. The evidence also indicated that Lawson was paid a substantial sum of money in cash by Fox for the white powder. "The fact that a high price has been paid for the substance is also evidence tending to indicate that it was in fact [a narcotic]." United States v. Atkins, *supra*, 473 F.2d at 314. See also United States v. Fiotto, 454 F.2d 252, 254 (2d Cir. 1972), cert. denied, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117; Toliver v. United States, *supra*. Finally, the transaction was carried out in secrecy with the powder being packed into a cosmetic bag for transportation. United States v. Fiotto, *supra*.

The evidence was, likewise, sufficient to support the jury's verdict with respect to the conspiracy count. The evidence showed that Lawson agreed to sell cocaine to Fox and to assume responsibility for delivering the substance to Chicago, that Lawson packed white powder into a cosmetic bag and directed Myrna Pierce to take it to Chicago, and that Pierce, upon returning to Jamaica, gave Lawson the money she had received in exchange for the substance. The fact that Lawson might not have been aware of every detail of the plan or every individual involved in the conspiracy is irrelevant since he clearly knew of the conspiracy's essential objective and acted to further it. Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Fellabaum, 408 F.2d 220, 224 (7th Cir. 1969), cert. denied, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109.

The Government's case against Lawson, after the testimony of Aurilio

and Cunningham had been stricken, rested entirely on the testimony of Fox, Zaretsky, and Pierce. Lawson asserts that the testimony of these witnesses should be disregarded since all of these witnesses had, at the time of Lawson's trial, pled guilty and received probation. The jury was aware of the fact that these witnesses had pled guilty to narcotic offenses and that they had received probation. The credibility of these witnesses was a matter for the jury to determine. The testimony of the witnesses in question was not so incredible that the jury could not have relied upon it in reaching its verdict.

**IV**

The defendant next contends that the district judge committed reversible error by: (1) refusing to instruct the jury on the definition of reasonable doubt, although both the defendant and the Government tendered such an instruction, and (2) incorrectly instructing the jury on the presumption of innocence.

**(1)**

Prior to final arguments, the court reviewed with counsel the instructions that were to be given and refused. When the tendered instructions on reasonable doubt were reached, attention was first given to the instruction submitted by Lawson, which read as follows:

"The law presumes a defendant to be innocent of crime. Thus a defendant, although accused, begins the trial with a 'clean slate'—with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

"It is not required that the government prove guilt beyond all possible

doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense —the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that you would be willing to rely and act upon it unhesitatingly in the most important of your own affairs.

"The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

"The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. The burden never shifts to a defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

"A reasonable doubt exists whenever, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge. So if the jury views the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should of course adopt the conclusion of innocence. Devitt and Blackmar § 11.01"

The court characterized this instruction, which covers matters other than defining reasonable doubt, as being argumentative which to some extent it is. The judge also stated that it was inaccurate in that he did not believe that the standard of beyond a reasonable doubt encompasses the concept "to a moral certainty." Because of the result we reach we do not need to decide the validity of this ground of rejection. We note that "[s]ome courts define reasonable doubt as requiring persuasion 'to a reasonable or moral certainty.' " 2 Wright, Federal Practice and Procedure § 500, at 342–43. Thus, if the effort is launched at definition, the phrase as stated in the tendered instruction has had judicial approval. However, as illustrative of the

difficulties of defining "reasonable doubt" in a manner acceptable to appellate courts, to which problem we will subsequently direct further attention, we note in the case of United States v. Byrd, 352 F.2d 570, 575 (2d Cir. 1965), the court faulted an alternative definition reading, "It is a doubt to a moral certainty," on the basis that "doubt" and "certainty" are antithetical and the use would tend to create more confusion than light in the minds of the jury. But see, United States v. Acarino, 408 F.2d 512, 517 (2d Cir. 1969).

As we have noted, the Government also tendered an instruction defining reasonable doubt. In so doing, the Government counsel expressed in colloquy with the court some concern as to whether the failure to give a defining instruction would be error since the defendant had tendered an instruction on the subject. The Government's instruction, which was LaBuy 6.01–3, reads as follows:

"A reasonable doubt means a doubt that is based on reason and must be substantial rather than speculative. It must be sufficient to cause a reasonably prudent person to hesitate to act in the more important affairs of his life."

The district court declined to give either instruction, stating:

"The only question before me is whether I should not proceed to define reasonable doubt. I am disinclined to do so. I believe that in a criminal case, we start with the defendant's presumption of innocence, and we proceed to the overcoming of that presumption of innocence beyond a reasonable doubt. I believe that it minimizes beyond a reasonable doubt or dilutes it to undertake to define it, and I do not see that we gain one whit by telling the jury what it isn't."

If the judge had given either of the tendered instructions, each of which came from acceptable authority, we would have no difficulty in saying that the subject had been adequately covered;

indeed, we entertain the belief that the result of the jury's decision probably would have been unchanged if either had been given. The court did not do so however, and it is necessary to turn to the question of whether the failure requires a reversal.

What has been referred to as the federal rule is set forth in Holland v. United States, 209 F.2d 516, 522–523 (10th Cir. 1954), aff'd, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, in which Judge Murrah speaking for the court stated:

> "There are many definitions of 'reasonable doubt.' Some courts assert that the words themselves carry their own best definition and that any attempts at clarification or definition tend only to confuse an otherwise simple phrase. See 20 Am.Jur.Evidence, Sec. 1257; 53 Am.Jur. Trial, Sec. 751, 36 Words & Phrases, Reasonable Doubt, pp. 297, 319; Wigmore on Evidence, 3rd Ed., Vol. IX, Sec. 2497. Under the federal rule, however, the accused is entitled to a definition of the term 'reasonable doubt', and failure to instruct upon request has been held to constitute error. Nanfito v. United States, 8 Cir., 20 F.2d 376; Blatt v. United States, 3 Cir., 60 F.2d 481; Egan v. United States, 52 App. D.C. 384, 287 F. 958; Mundy v. United States, 85 U.S.App.D.C. 120, 176 F.2d 32; Schencks v. United States, 55 App.D.C. 84, 2 F.2d 185. But, a proper definition of the term does not depend upon the observance of a ritual or the use of precise words found in some accepted definition. United States v. Schireson, 3 Cir., 116 F.2d 881, 132 A.L.R. 1157; United States v. Stoehr, D.C., 100 F.Supp. 143, af-

firmed, 3 Cir., 196 F.2d 276. It is sufficient if the jury is given to understand that reasonable doubt as applied to the measure of its persuasion means a real or substantial doubt generated by the evidence or a lack of it; and that beyond a reasonable doubt means to a reasonable or moral certainty. Wigmore, supra, Sec. 2497."

*Holland* is dicta as to the particular point here involved for there a defining instruction was given which was found to be acceptable. The dicta status is true of other cases enunciating the rule, e. g., Friedman v. United States, 381 F. 2d 155, 160 (8th Cir. 1967), and Williams v. United States, 271 F.2d 703, 705 (4th Cir. 1959). However, application of the rule has also been a dispositive matter: Blatt v. United States, 60 F.2d 481 (3d Cir. 1932); Nanfito v. United States, 20 F.2d 376, 378 (8th Cir. 1927); Schencks v. United States, 55 App.D.C. 84, 2 F.2d 185, 187 (1924); Egan v. United States, 52 App.D.C. 384, 287 F. 958, 967 (1923). It is also to be noted, however, that in all of these cases except *Blatt* there were other grounds of error.

■ This court has never ruled on the precise issues presented here.[5] Of greater significance is the fact that the Supreme Court also has not ruled on the precise issue. We are unaware of any court of appeal decision contra to those cited above. Nevertheless, with all due deference to the decisions from other circuits, upon consideration of the issue we are of the opinion that the failure to give a defining instruction of "beyond a reasonable doubt," even though an acceptable instruction has been tendered, should not be the basis for reversing an otherwise fairly conducted trial.[6] We

---

5. In United States v. Jonikas, 197 F.2d 675 (7th Cir. 1952), cert. denied, 344 U.S. 877, 73 S.Ct. 171, 97 L.Ed. 679, the defendant, in a collateral attack on the judgment under 28 U.S.C. § 2255, objected, *inter alia*, to the trial court's definition of "reasonable doubt" and contended that "actually the Court gave no definition for reasonable doubt." 197 F. 2d at 679. This court held, however, that the inadequacy of the charge did not amount to a denial of due process such as to oust

the court of jurisdiction to enter the judgment. *Id.* See also Kenion v. Gill, 81 U.S. App.D.C. 96, 155 F.2d 176, 180 (1946).

6. The matter of the rule adopted herein for this circuit, i. e., that the failure to give a defining instruction of "beyond a reasonable doubt," even though an acceptable instruction has been tendered, is not the basis for reversal, being apparently contrary to a rule which has been enunciated in several federal

also, of course, are assuming that the jury has been instructed that the prosecution must prove its case beyond a reasonable doubt and that the burden of doing so remains with the prosecution.[7]

We are here dealing with ordinary English words of common acceptance. "I doubt that" is a common expression. It is ordinary practice in negligence cases to instruct on the standard of care of a reasonable man. It would not seem to serve much purpose to resort to the antonym and define reasonable doubt as being doubt that was not unreasonable under the evidence. The phrase is not esoteric, such as *res ipsa loquitur*, nor is it confusingly similar to other more common words such as "proximate" or some of those employed in patent law.

Because of the very commonness of the words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion. That this difficulty may be surmounted is evidenced by the attempts which have been approved, although the language of approval has frequently implicitly suggested the difficulties of articulation.[8] That the difficulties may be surmounted, however, does not mean

in our opinion that the effort has to be made.

■ The essential aspect of the matter it appears to us is that the jury clearly understand that there must be proof persuasive beyond a reasonable doubt. Defining the term should be at the option of the trial judge even though a defining instruction is tendered. Lack of definition would not appear to be prejudicial. Thus, although the Fourth Circuit purports to follow the so-called *federal rule*, Williams v. United States, *supra*, 271 F.2d at 705, nevertheless, in the absence of a request or objection, that court was "unwilling to say the failure [to define] when not requested, was error." United States v. Quinn, 315 F.2d 425, 426 (4th Cir. 1963). Judge Murrah, whose opinion in *Holland* has been quoted hereinbefore, recognized that some courts adhered to the view that definition only tended to confuse. Confusion of the jury thinking on this essential aspect of a criminal case, of course, should be avoided. The *Holland* opinion cites, *inter alia*, Words and Phrases. Turning to volume 36 of the Permanent Edition of that work, at 510 et seq., we find numerous state cases

---

cases, the present opinion as to that point has been circulated among all the judges of this court in regular service and no judge has voted that the matter be reheard *en banc*.

7. The district court made it abundantly clear that the proof must persuade beyond a reasonable doubt. Thus:
"The burden of proving the defendant guilty beyond a reasonable doubt rests on the Government. This burden never shifts throughout the trial.
"The law does not require a defendant to prove his innocence or to produce any evidence. If the Government fails to persuade you that the defendant is guilty beyond a reasonable doubt, then you must acquit him.

\*    \*    \*    \*    \*

"[Y]ou cannot find the defendant Lawson guilty of conspiracy unless you find beyond a reasonable doubt that he participated in the conspiracy as charged in the indictment with at least one other person.

\*    \*    \*    \*    \*

"What the evidence in the case must show beyond a reasonable doubt in order

to establish proof that a conspiracy existed is that the defendant and other persons in some way or manner, through some contrivance, expressly or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan.

\*    \*    \*    \*    \* .

"To establish specific intent, the Government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids, purposely intending to violate the law."
In addition to the foregoing examples, the district court in seven other instances relating to the evidence informed the jury of the necessity of proof beyond a reasonable doubt. Whether a jury understands all of the intricacies of complicated instructions, there can be little doubt that these jurors were aware that to convict they had to be persuaded beyond a reasonable doubt.

8. Thus, in *Holland, supra*, 209 F.2d at 523: "While the court's definition of 'reasonable doubt' may not be a model of clarity and conciseness, we think it does suffice to convey the legally acceptable meaning of the term."

expressing the opinion that there need be no definition. Without further lengthening this opinion by discussing the individual cases cited there, we note statements such as that definition is impossible, that the phrase is self-defining, that there is no equivalent phrase more easily understood, that every attempt to explain renders an explanation of the explanation necessary, that the better practice is not to attempt the definition, and that any effort at further elucidation tends to misleading refinements. That many state courts have so stated is persuasive that the lack of the refining definition does not deprive a defendant of a fair trial. Suggestive that the judicial path has not been an easy one when efforts to define the term have been undertaken is the fact that 36 Words and Phrases, beginning at 483 devotes sixty-one pages to various efforts at explication. Many of these purported definitions do not upon fair analysis say anything more than the simple phrase itself.

For the reasons indicated we find nothing in this record to make us fear that the jury was unaware of the heavy burden of persuasion placed upon the Government. That ultimately is the real purpose of a defining instruction in any event.

However, before leaving this issue we find it is necessary to advert to the manner in which the issue was presented to the court in the present case. Counsel for the defendant in the instructions conference observed, "My instruction does include a definition of reasonable doubt which I *suggest* should be given." (Emphasis added.) Nowhere in the record do we find that counsel advised the court of the cases cited by the defendant to us on this appeal as stating the federal rule. Counsel did tell the court that the instruction was "Devitt and Blackmar's, which also has been approved by the case law." In looking at that work, however, we find nothing in the annotations of the 1970 edition which would appear to alert the court to the so-called federal rule. On the other hand, one annotation does deal with the "problems of defining 'reasonable doubt.'" 1 Devitt and Blackmar, Federal Jury Practice and Instructions, at 206. One of the cases cited is Dunbar v. United States, 156 U.S. 185, at 198–199, 15 S.Ct. 325, at 330, 39 L.Ed. 390 (1895), in which the court stated:

"Again, error is alleged in the instructions in respect to the matter of reasonable doubt. It is urged that the court failed to instruct the jury as to what constitutes a reasonable doubt, and that in speaking of it, it used the term 'strong probabilities.' Repeated attempts have been made by judges to make clear to the minds of the jury what is meant by the words 'reasonable doubt'; but, as said by Mr. Justice Woods, speaking for this court, in Miles v. United States, 103 U.S. 304, 312 [26 L.Ed. 481]: '[a]ttempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury.'"

See also, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

It does not appear to us that reference to the work supporting the tendered instruction would have done other than to enforce the judge's determination not to define. An underlying point here, however, is that we read Rule 30 Fed.R. Crim.P., less narrowly than defendant apparently did. All that was done was to tender the instruction by way of suggestion. After the instructions had been read to the jury, the following occurred: "I reiterate the objections which I made prior to the charge, and during our conference, and without specifying them, if that is agreeable with you, I would ask that those objections be adopted as having been made now as though I did specify each and every one of them. THE COURT: They may be. MR. WALSH: And I have two specific ones I would like to make, and that is that I object specifically to your including the word, 'until' in the instruction on presumption of innocence, and I specifically object to your declining to in-

struct on the definition of reasonable doubt." Aside from the propriety of the incorporation by reference, cf. Hetzel v. Jewel Companies, 457 F.2d 527, 535–536 (7th Cir. 1972), stating that the party specifically objects to the failure to give an instruction which had been tendered does nothing more than go through the motions of complying with the requirement of "stating distinctly the matter to which he objects and the *grounds* of his objection." Rule 30. (Emphasis added.)

In Tomley v. United States, 250 F.2d 549, 551 (5th Cir. 1957), cert. denied, 356 U.S. 928, 78 S.Ct. 116, 2 L.Ed.2d 759 (1958), the court dealt with a similarly cursory obeisance to the Rule as follows:

"In his objection, counsel for defendant merely restated his requests, but did not even attempt to give the *grounds* for his complaint that the court below had failed to give the instructions that he had requested. Hence, there was a failure to comply with Rule 30 of the Federal Rules of Criminal Procedure . . .. This being so, and there being no prejudicial error in the court's failure to give the requested charges, appellant may not *now complain of their refusal.*" (Emphasis in original, footnote omitted.)

■ We agree with the Fifth Circuit that the defendant is not in a position to complain of the failure to give the tendered instruction. Not only the spirit, but the letter of Rule 30 required the statement of grounds.

There was in the present case an additional factor over and above the basic requirement of compliance with the rule in that the trial judge was an Illinois lawyer. His view was in accord with that of the Illinois Supreme Court. "This court has repeatedly held that the legal concept of 'reasonable doubt' needs no definition, and that where an involved instruction on that concept is given it may be deemed prejudicial error." People v. Cagle, 41 Ill.2d 528, 536, 244

N.E.2d 200, 204 (1969). See also People v. Whittaker, 45 Ill.2d 491, 496, 259 N. E.2d 787, 789 (1970).

If the federal rule was so drastically different as the defendant now contends, he should have then so contended by, at the very least, bringing to the attention of the court the federal authorities supporting his position.

(2)

With respect to the presumption of innocence, the district court charged the jury:

"A defendant in a criminal case is presumed by law to be innocent. That presumption remains with him throughout the trial *unless and until* he is proved guilty of the crime charged by credible evidence beyond a reasonable doubt." (Emphasis added.)

Lawson argues that the inclusion of the word "until" in the court's instruction constituted error because it created the impression that proof of guilt beyond a reasonable doubt was a certainty.

■ We find this argument unpersuasive. The jury was instructed that the presumption of innocence remains with the defendant *unless* and until such time as he is proved guilty by credible evidence beyond a reasonable doubt. In United States v. Shotwell Mfg. Co., 287 F.2d 667, 677 (7th Cir. 1961), aff'd 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), and United States v. Senior, 274 F.2d 613, 616 (7th Cir. 1960), this court reviewed instructions similar to the one given in the present case and held that there was no error if, considering the instructions as a whole, the jury was instructed that the burden of proof never shifts to the defendant and that all the evidence should be considered by them in reaching a verdict. In the present case, when we consider the instructions as a whole, we are convinced that the jury was adequately charged on these matters.[9] Compton v. United States, 305 F.2d 119, 121 (9th Cir. 1962).

9. The court charged, *inter alia*:
"The law makes no distinction between the weight to be given to either direct or cir-

cumstantial evidence. It requires only that you, after weighing *all of the evidence*, must be convinced of the defendant's guilt beyond

## V

Lawson further asserts that because he was a resident of Jamaica at all times during the alleged conspiracy and importation, the district court lacked jurisdiction over him. The evidence established, however, that Lawson was a member of the conspiracy; that the object of the conspiracy was to violate the narcotics laws of the United States; that the conspiracy was carried on partly in and partly out of the United States; and that overt acts were committed within the United States. It is well established that, in such a situation, the federal district court has jurisdiction to try the defendant for conspiracy even though he was corporeally outside the United States at all times during the alleged conspiracy. Ford v. United States, 273 U.S. 593, 620, 47 S.Ct. 531, 71 L.Ed. 793 (1927); United States v. Correa–Negron, 462 F.2d 613, 614 (9th Cir. 1972); Rivard v. United States, 375 F.2d 882, 886 (5th Cir. 1967), cert. denied, 389 U.S. 884, 88 S.Ct. 151, 19 L. Ed.2d 181. Moreover, as the Fifth Circuit pointed out in *Rivard, supra,* where, as here, the substantive offense is committed within the United States, the district court also has jurisdiction over the defendant, as a principal,[10] with regard to the substantive offense, even though the defendant's participation took place outside the United States.

Lawson further maintains that even if jurisdiction existed, venue did not properly lie in the Northern District of Illinois since he first entered the United States and was arrested in Puerto Rico. This contention is frivolous. Venue was properly laid in the Northern District of Illinois where the offenses were "continued or completed." 18 U.S. C. § 3237(a). Rivard v. United States, *supra,* 375 F.2d at 888. It has long been recognized that, in conspiracy cases, venue is proper, under § 3237, in the district where the conspiracy was formed or in any district in which any overt act in furtherance of the conspiracy was committed, even though the defendant has never been present in that district. Downing v. United States, 348 F.2d 594, 598 (5th Cir. 1965), cert. denied, 382 U. S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155.

## VI

In answering questions on direct examination, Fox and Zaretsky on several occasions referred to substances as "cocaine."[11] Additionally, at one point during the trial, the prosecutor referred to the substance being discussed as "cocaine." The defendant contends that the district court erred in denying his motions for a mistrial based on these references to "cocaine."

We note, however, that each time Fox or Zaretsky referred to the substance as "cocaine," the district court sustained the defendant's objection. Similarly, on the one occasion that the prosecutor referred to the substance as "cocaine," the trial judge sustained an objection from the defense. Moreover, in almost every instance, the court ordered the statement stricken from the

---

a reasonable doubt before you can find him guilty.

\* \* \* \* \*

"The burden of proving the defendant guilty beyond a reasonable doubt rests on the Government. This burden never shifts through the trial.

"The law does not require a defendant to prove his innocence or to produce any evidence. If the Government fails to persuade you that the defendant is guilty beyond a reasonable doubt, then you must acquit him.

\* \* \* \* \*

"You will, of course, first ascertain whether or not the substance in question is in fact cocaine as alleged, and in doing so you will consider *all the evidence.* in the case which may aid in the determination of that issue." (Emphases added.)

10. Lawson's acts of counselling, aiding and abetting Fox, Zaretsky, and Pierce in the importing of cocaine make Lawson responsible as a principal under 18 U.S.C. § 2.

11. This, of course, is to be differentiated from the testimony that Lawson, himself, referred to the substance as "cocaine," which was properly in evidence as an admission of a party.

record and instructed the jury to disregard it. In his final charge to the jury, the district judge again instructed the jury that "[t]estimony and exhibits to which I have sustained an objection, or which I have ordered stricken from the record do not constitute evidence and you must not consider it." We also note that there is no indication that the prosecutor solicited the use of the word "cocaine" by Fox or Zaretsky. The prosecutor's own single reference to "cocaine," likewise, appears to have been inadvertent rather than deliberate. Under these circumstances, the district court's denial of Lawson's motions for a mistrial was not erroneous. See United States v. Kidd, 446 F.2d 1385, 1386 (5th Cir. 1971); United States v. Jiminez-Badilla, 434 F.2d 170, 174 (9th Cir. 1970); United States v. Schwartz, 398 F.2d 464, 470 (7th Cir. 1968), cert. denied, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969).

## VII

Finally, Lawson contends that, with respect to the substantive count, there was a variance between the indictment and the evidence. The indictment for this count charged with the defendant and others did "in the Northern District of Illinois, Eastern Division, and elsewhere . . . import and cause to be imported . . . cocaine . . . into the United States from Jamaica . . . ." The evidence was in variance with this, according to Lawson, since it indicated that (1) Lawson was in Jamaica at all times in question, and (2) Myrna Pierce flew with the substance to Baltimore from Jamaica and then from Baltimore to Chicago. Any importation, the defendant concludes, was to Baltimore, not to the Northern District of Illinois. This argument is frivolous. The indictment charges that the offense occurred in "the Northern District of Illinois, Eastern Division, *and elsewhere*." (Emphasis added.) Moreover, even assuming a variance existed, the defendant has wholly failed to show its materiality.

United States v. Morado, 454 F.2d 167, 170 (5th Cir. 1972), cert. denied, 406 U. S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116. Finally, the fact that Lawson resided in Jamaica during the time of the importation is irrelevant. Lawson instructed Pierce to transport the cocaine to the United States and was, therefore, liable as a principal. 18 U.S.C. § 2.

Affirmed.